**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ANGELA STRICKLAND,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION No. 1:26-cv--2313** |
| | § | |
| **AUSTIN INDEPENDENT SCHOOL DISTRICT; STACIE HOLIDAY, in her individual capacity; CYNTHIA SOLIZ, in her individual capacity; and NICOLE GRIFFITH, in her individual capacity,** | § | |
| **Defendants.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Comes now, Angela Strickland ("Ms. Strickland" or "Plaintiff") and files this Original Complaint against Austin Independent School District ("AISD" or "the District"), Dr. Stacie Holiday ("Holiday"), in her individual capacity, Cynthia Soliz ("Soliz"), in her individual capacity, and Nicole Griffith ("Griffith"), in her individual capacity (collectively "Defendants"), and would show the court as follows:

**1.**

**Jurisdiction and Venue**

1.1 This action arises under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 and 42 U.S.C. § 12203; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and 42 U.S.C. § 1983. The Court has jurisdiction of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

1.2 Venue properly lies in this Court pursuant to the general venue statute, 28 U.S.C. § 1391(b), because all Defendants reside in this District and a substantial part of the events giving rise to the claims occurred in Travis County, Texas, within the Austin Division of the Western District of Texas.

**2.**

**The Parties**

2.1 Ms. Strickland is an individual residing in Travis County, Texas. She is the mother of L.S., a young woman with a disability who was at all times pertinent hereto enrolled in, or seeking enrollment in, the Ann Richards School for Young Women Leaders ("ARS"), a school within the Austin Independent School District. L.S. is now an adult and is not a party to this action. Her initials are used to protect her privacy with respect to sensitive medical and educational information. Ms. Strickland brings this suit in her individual capacity to redress retaliation and interference directed at her because of her own advocacy on behalf of her daughter's civil rights.

2.2 Austin Independent School District is a public school district and political subdivision of the State of Texas. It may be served through its Superintendent. AISD is a "public entity" within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1), and is, and was at all relevant times, a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act. As a political subdivision rather than an arm of the State, AISD is not entitled to Eleventh Amendment immunity.

2.3 Dr. Stacie Holiday was at all relevant times an Executive Director of AISD with supervisory authority over the ARS campus administration. She is sued in her individual capacity for actions taken under color of state law. She may be served wherever she may be found.

2.4 Cynthia Soliz was at all relevant times an Associate General Counsel of AISD. She is sued in her individual capacity for actions taken under color of state law during her employment with the District. She may be served wherever she may be found.

2.5 Nicole Griffith was at all relevant times the Principal of ARS. She is sued in her individual capacity for actions taken under color of state law during her employment with the District. She may be served wherever she may be found.

**3.**

**Factual Background**

3.1 L.S. attended ARS beginning in the seventh grade. She was academically successful and engaged in campus life, and she was elected class president by her peers. L.S. is a young Black woman. In late seventh grade, L.S. received a serious mental health diagnosis. Her condition is a disability within the meaning of the ADA and Section 504: it substantially limits multiple major life activities, including thinking, concentrating, communicating, caring for oneself, and interacting with others. Features of her condition, known to the District throughout the relevant period, include anosognosia, a documented lack of insight into her own illness, and hygiene-related symptoms that her treating physician explained to the school were a feature of her underlying medical condition.

3.2 Ms. Strickland has been L.S.'s principal advocate throughout her education. Her advocacy has included requesting accommodations and supports, providing medical documentation, opposing conduct she identified as discriminatory, filing formal grievances, addressing the AISD Board of Trustees, and speaking publicly about the District's treatment of students with disabilities. Each of these activities is protected under the ADA, Section 504, and the First Amendment. The District was aware of this advocacy throughout the relevant period.

3.3 Beginning in or around November 2023, during L.S.'s eleventh grade year, her attendance and academic performance declined as a result of her disability. Rather than referring L.S. for evaluation or convening the disability-related processes required of it, ARS campus administration responded by seeking to remove her.

3.4 In March 2024, Ms. Strickland arranged a conference call between L.S.'s treating physician and the school. At or around the same time, ARS personnel suggested that L.S. be unenrolled so as not to "disadvantage" other students, and a school counselor told Ms. Strickland that L.S.'s remaining enrolled "would be unfair to the other kids." Ms. Strickland refused to withdraw her daughter and objected in writing that the suggestion was discriminatory. This written opposition to disability discrimination was protected activity.

3.5 Within approximately one day of Ms. Strickland's refusal and written objection, ARS withdrew L.S. from enrollment without notice to her parents. The District's own subsequent investigation confirmed that no formal written notice of withdrawal was provided and that the withdrawal violated District procedures. The District's Executive Director of Special Education later confirmed in that same investigation that withdrawing a student with known medical issues, or a suspected disability, without conducting a special education evaluation was a significant administrative misstep contrary to the District's obligations under federal Child Find provisions.

3.6 In April 2024, after Ms. Strickland complained about the unenrollment, ARS promised that L.S. would be re-enrolled when she was ready to return. In May 2024, when L.S. visited campus for a meeting about the following school year, ARS staff made the first of a series of reports to Child Protective Services ("CPS") concerning Ms. Strickland. That report, like those that followed, centered on hygiene-related symptoms that ARS already knew, from Ms. Strickland and from L.S.'s treating physician, were a documented feature of L.S.'s medical

condition and not evidence of neglect. These reports began only after Ms. Strickland declined the school's request that she voluntarily withdraw L.S.

3.7 During the same period, campus administrators deliberately cut off communication with Ms. Strickland. As the Assistant Principal later admitted to District investigators regarding the withdrawal: "I'm not going to call and see what happens. And I'll admit, I didn't call, and there was no contact from mom." The District's investigators found this admission indicated an intentional failure to make the good faith efforts required by District policy.

3.8 On or about August 20, 2024, Ms. Strickland completed re-enrollment paperwork and L.S. returned to campus. Rather than enrolling her, staff provided L.S. a paper "hand schedule" because she had not been entered in the District's system, and school staff contacted the AISD Police Department and CPS.

3.9 AISD's Student Enrollment office stated that Soliz had placed a hold on L.S.'s enrollment. Holiday separately issued an explicit verbal directive to Griffith: "You will not enroll the student." The District's own investigation found that this directive was undocumented and based on discomfort rather than policy or law. Contemporaneous campus notes reviewed by District investigators state that the campus would not enroll L.S. and was "looking for a way to frame the denial."

3.10 On or about August 21, 2024, ARS administrators asked to meet privately with Ms. Strickland and asked her to place L.S. on homebound instruction because, in their words, "she's too sick." Ms. Strickland refused and continued to insist on L.S.'s right to attend school. This, too, was protected activity.

3.11 On or about August 22, 2024, the day after Ms. Strickland's refusal, school personnel set in motion an involuntary psychiatric detention of L.S., then seventeen years old. Although Ms.

Strickland was present and available, she was never notified of the enrollment hold directive, the involvement of the Mobile Crisis Outreach Team ("MCOT"), or the emergency detention process, and she was excluded from the decision-making process entirely. A campus nurse's contemporaneous assessment finding nothing clinically alarming was never shared with responding officers or the crisis team. Administrators repeatedly framed L.S. to MCOT and law enforcement as a safety risk without evidentiary basis. Upon information and belief, and as captured on law enforcement body camera footage, Holiday told officers during the detention process that "Mom is threatening the principal and AP, and threatening their children." That statement was false; a recording of the meeting at issue reflects that Ms. Strickland said only that any staff member's own child could become ill and asked that L.S. be treated as they would want their own sick child treated.

3.12 On or about August 23, 2024, the receiving hospital declined to hold L.S., concluding she did not meet the qualifications for a psychiatric hold, and provided a note clearing her to return to school. When L.S. returned to campus on or about August 26, 2024, she still had not been enrolled.

3.13 Materials used to justify the emergency detention characterized L.S.'s documented, real accomplishment of being elected class president as a delusion. The psychiatrist involved has since told Ms. Strickland that he did not order the hold and that it was apparent on his arrival that campus administrators were already building a case to exclude L.S. The false class-presidency claim mirrored a separate admitted fabrication in the same period: Griffith admitted to District investigators that she falsely told AISD Student Enrollment, in writing, that a truancy officer had attempted to return L.S. to school, describing the falsehood as a deliberate "strategy."

3.14 Griffith's conduct throughout this period was marked by repeated deception. In addition to the admitted truancy-officer fabrication described above, Griffith was recorded telling a police officer, regarding the family's completed transfer request, "I can deny it and say [she's] not ready"; she directed Student Services in writing to transfer L.S. and then, by a second email, to "hold off" and "disregard" the first; she told CPS that staff could not get L.S. into the enrollment system "because honestly we just needed more time"; and the District's own investigation found that her negative framing of L.S. to crisis responders and to the evaluating psychiatrist directly influenced the psychiatric assessment and the resulting emergency detention, and recommended her termination for, among other things, misrepresentation of facts. Upon information and belief, this conduct was part of a broader pattern of deceptive statements, misleading official communications, and false or misleading entries in District records and systems by Griffith concerning L.S.'s withdrawal, enrollment, and detention.

3.15 On or about August 30, 2024, while the family was participating in a voluntary services case with CPS, Soliz contacted CPS and requested a "professionals only" meeting that would exclude Ms. Strickland, despite Ms. Strickland being an active party to a voluntary, non-adversarial matter in which no findings of abuse or neglect were ever made. Upon information and belief, Soliz warned Ms. Strickland that if she did not stop speaking to Board members about the case, L.S.'s return to ARS would be off the table.

3.16 At a staffing meeting concerning L.S.'s enrollment attended by Griffith, the assistant principal, Holiday, and Soliz, and memorialized in a written memorandum by an AISD Police Department sergeant to the Chief of Police, Soliz repeatedly used profanity, in the sergeant's words using "the word 'fuck' or 'fucking'" to "express her unwillingness to subject the school, students or staff to any dangers that may arise with the student in question being on the campus."

Participants in the same period discussed issuing a criminal trespass warning against L.S., a validly enrolled student, if she continued to come to campus.

3.17 On September 11, 2024, the family was released from the voluntary services case with no findings of abuse or neglect. On September 13, 2024, Ms. Strickland filed a formal grievance with the District. Three days later, on September 16, 2024, L.S. was re-admitted to ARS. In mid-September 2024, AISD's General Counsel sent Ms. Strickland an email apologizing for staff's actions. In early October 2024, Ms. Strickland learned that Soliz's employment with the District had ended.

3.18 In March 2025, the District's Office of Professional Standards ("OPS") completed an employment investigation, Case #713, into the withdrawal, blocked re-enrollment, and psychiatric detention of L.S. OPS found a pattern of decisions and omissions that collectively denied L.S. her right to education and support, confirmed Holiday's "You will not enroll the student" directive, documented the principal's admitted fabrications and statements that L.S. was "not well enough to be at school," and documented that the administrators involved failed to notify Ms. Strickland of the enrollment hold or the psychiatric detention. Holiday acknowledged to investigators that her failure to notify Ms. Strickland of the hold was "one thing I wish I had done differently." Although repeatedly named by staff as having directed the enrollment hold, Soliz was never interviewed by OPS.

3.19 On March 26, 2025, Ms. Strickland presented her grievance at Level Three to the AISD Board of Trustees. In reliance on District commitments, including a culture-and-climate study, a community committee, and staff training, the family declined to escalate the matter to a Texas Education Agency hearing. Approximately eighteen months later, those commitments have not been implemented. Upon information and belief, OPS recommended the termination of Griffith

and of Holiday, and the District thereafter failed to report either administrator to the State Board for Educator Certification.

3.20 The retaliation continued after L.S. returned for her twelfth grade year. Weekly check-ins that the interim principal promised regarding the social-inclusion plan Ms. Strickland had requested were instead redirected to commentary on L.S.'s hygiene. In October 2025, after Ms. Strickland sent approximately twenty emails and a preservation-of-evidence notice advocating for a response regarding L.S.'s Mock Trial tryout, L.S. was excluded from the Mock Trial program, and Ms. Strickland's request that the school review the coach's response for discriminatory language was declined outright. In the fall of 2025, a teacher initiated a further CPS referral concerning the same medically explained symptoms, and Adult Protective Services staff, disregarding an agreed off-campus meeting location for a welfare check, appeared at school, insisted on seeing L.S. alone, and threatened to arrest Ms. Strickland, in front of the principal, if she interfered. A separate report to Adult Protective Services was tagged by that agency itself as malicious.

3.21 In or around April 2026, Soliz published public statements accusing Ms. Strickland of fabricating her claims and of abusing L.S., stating among other things that Ms. Strickland "had to fabricate a defense because she was facing liability for abusing the student herself." These statements referenced internal information accessible to Soliz only through her former employment with the District, were amplified into an ARS-affiliated online community of approximately 6,000 members, and were repeated by other parents and media. The statements are direct evidence of the retaliatory animus that drove Soliz's conduct during her employment, and they compounded the harm to Ms. Strickland from the Defendants' course of conduct.

3.22 The pattern throughout was consistent: each time Ms. Strickland engaged in protected advocacy, refusing to withdraw L.S., objecting in writing to discrimination, filing grievances, speaking to Trustees, engaging the press, adverse action against her followed closely in time, including the unnoticed withdrawal, the enrollment hold, the psychiatric detention of her daughter arranged without her knowledge while she stood available, repeated child-welfare reports built on symptoms the school knew to be medical, threats of arrest, exclusion of her daughter from school activities, and a public campaign painting her as a dangerous and abusive parent. These actions would deter a person of ordinary firmness, and would deter any reasonable parent, from continuing to advocate for a disabled child.

3.23 As a direct and proximate result of Defendants' conduct, Ms. Strickland has suffered damages including emotional distress, humiliation, and mental anguish; injury to her reputation in her community; exposure to repeated child-welfare and adult-protective investigations initiated on false premises; out-of-pocket expenses; and injury to her business and earning capacity.

## 4.

## <u>Administrative Remedies</u>

4.1 Plaintiff is not herein seeking relief available under the Individuals with Disabilities Education Act ("IDEA"). The claims in this action belong to Ms. Strickland individually and seek redress for retaliation and interference directed at her because of her own protected advocacy; they do not seek relief for the denial of a free appropriate public education, and the gravamen of this Complaint is not the adequacy of any educational program. Per *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017), and *Perez v. Sturgis Public Schools*, 598 U.S. 142

(2023), Plaintiff's claims in this action are for compensatory damages and other relief not available under IDEA, and no administrative exhaustion is required.

**5.**

**Claim for Relief Count 1: Americans with Disabilities Act - Retaliation (Against AISD)**

5.1 Plaintiff incorporates and realleges sections 1-4 as if fully incorporated herein.

5.2 Plaintiff is entitled to protection from retaliation pursuant to 42 U.S.C. § 12203(a), which prohibits discrimination against any individual because such individual has opposed any act or practice made unlawful by the ADA. A parent who advocates for the rights of a child with a disability engages in protected activity in her own right and may bring a retaliation claim in her own name.

5.3 Plaintiff engaged in protected activity under the ADA by opposing the District's discriminatory practices, by advocating for her daughter's rights and accommodations, by refusing demands that she withdraw her daughter or consent to homebound placement, and by making complaints, filing grievances, and addressing the Board of Trustees, as described herein.

5.4 AISD, through its administrators, counsel, and campus staff, took materially adverse actions against Plaintiff because of that protected activity, including withdrawing L.S. without notice immediately after Plaintiff's written objection; placing and maintaining an unlawful hold on L.S.'s enrollment; arranging an involuntary psychiatric detention of Plaintiff's minor daughter while concealing the process from Plaintiff; making and facilitating repeated child-welfare reports premised on symptoms known to be medical; conditioning L.S.'s return on Plaintiff ceasing communications with Board members; and continuing adverse treatment after L.S.'s return, as described herein. A causal connection exists between the protected activity and each

adverse action, as demonstrated by, among other things, the close temporal proximity alleged herein and the District's own investigative findings.

5.5 AISD thereby violated 42 U.S.C. § 12203, and Plaintiff suffered damages as a direct and proximate result.

**6.**

**Claim for Relief Count 2: Section 504 of the Rehabilitation Act - Retaliation (Against AISD)**

6.1 Plaintiff incorporates and realleges sections 1-5 as if fully incorporated herein.

6.2 Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, including 34 C.F.R. § 104.61, incorporating 34 C.F.R. § 100.7(e), prohibit recipients of federal financial assistance from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right secured by Section 504, or because the individual has made a complaint or asserted such rights.

6.3 Plaintiff is informed and therefore alleges that AISD is and has been at all relevant times the recipient of federal financial assistance, and that part of that financial assistance has been used to fund the operations and activities described herein. Congress has provided that a State shall not be immune under the Eleventh Amendment from suit in federal court for violations of Section 504, 42 U.S.C. § 2000d-7(a)(1); in any event, AISD, as a political subdivision, possesses no such immunity.

6.4 By the conduct described herein, AISD retaliated against Plaintiff for her protected advocacy in violation of Section 504, and Plaintiff suffered damages as a direct and proximate result.

**7.**

**Claim for Relief Count 3: Americans with Disabilities Act - Interference (Against AISD)**

7.1 Plaintiff incorporates and realleges sections 1-6 as if fully incorporated herein.

7.2 Separate from its prohibition on retaliation, the ADA makes it unlawful "to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected" by the ADA. 42 U.S.C. § 12203(b); 28 C.F.R. § 35.134.

7.3 AISD, through its administrators and counsel, coerced, intimidated, threatened, and interfered with Plaintiff in the exercise of her rights and in her aid to L.S. in the exercise of L.S.'s rights, including by excluding Plaintiff from notice of, and participation in, the enrollment hold and emergency detention processes while she was present and available; conditioning Plaintiff's access to her own daughter during the detention on her acquiescence; demanding "professionals only" meetings designed to exclude Plaintiff from a voluntary matter in which she was an active party; threatening that L.S.'s return to ARS would be off the table if Plaintiff continued speaking to Board members; contacting a member of Plaintiff's support network before a hearing; threatening Plaintiff with arrest for remaining present as her daughter's advocate; and routing decisions to L.S. directly, exploiting a documented symptom of her disability, in order to circumvent Plaintiff's advocacy.

7.4 AISD thereby violated 42 U.S.C. § 12203(b), and Plaintiff suffered damages as a direct and proximate result.

**8.**

**Claim for Relief Count 4: 42 U.S.C. § 1983 - First Amendment Retaliation (Against Holiday, Soliz, and Griffith)**

8.1 Plaintiff incorporates and realleges sections 1-7 as if fully incorporated herein.

8.2 At all relevant times, Holiday, Soliz, and Griffith acted under color of state law in their respective roles as an Executive Director, an Associate General Counsel, and a Principal of AISD.

8.3 Plaintiff engaged in speech and petitioning activity protected by the First Amendment to the United States Constitution, including filing grievances with the District, addressing the Board of Trustees, communicating with individual Trustees, engaging with the press, and objecting to the District's treatment of students with disabilities. This speech addressed matters of public concern, including a public school district's compliance with federal disability law and its treatment of a disabled student.

8.4 Because of that protected activity, Holiday, Soliz, and Griffith each took adverse actions against Plaintiff that would chill a person of ordinary firmness from continuing to engage in such activity. Holiday issued the directive that L.S. not be enrolled, framed L.S. as a safety risk to crisis responders and law enforcement without evidentiary basis, falsely told law enforcement that Plaintiff was threatening administrators and their children, and withheld from Plaintiff notice of the enrollment hold and the emergency detention of her daughter. Soliz placed and maintained the hold on L.S.'s enrollment, participated in discussions of a criminal trespass warning against a validly enrolled student, contacted CPS to arrange meetings excluding Plaintiff, contacted a member of Plaintiff's support network before a hearing, and expressly conditioned L.S.'s return to ARS on Plaintiff ceasing her communications with Board members, an explicit penalty on protected speech. Griffith implemented and enforced the exclusion, fabricated the truancy-officer

claim to Student Enrollment as an admitted "strategy" to justify it, framed L.S. and Plaintiff as safety threats to law enforcement, crisis responders, and the evaluating psychiatrist, withheld from Plaintiff notice of the hold and detention processes, made deceptive statements to CPS and to a member of Plaintiff's support network, and engaged in the broader pattern of deceptive conduct described herein.

8.5 Plaintiff's protected activity was a substantial and motivating factor in each such adverse action. The right to be free from governmental retaliation for protected speech and petitioning was clearly established at all relevant times, and no reasonable official in Defendants' positions could have believed this conduct to be lawful.

8.6 Holiday, Soliz, and Griffith thereby violated 42 U.S.C. § 1983, and Plaintiff suffered damages as a direct and proximate result. Their conduct was undertaken with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against each of them.

**9.**

**Claim for Relief Count 5: 42 U.S.C. § 1983 - Fourteenth Amendment (Against Holiday, Soliz, and Griffith)**

9.1 Plaintiff incorporates and realleges sections 1-8 as if fully incorporated herein.

9.2 The Fourteenth Amendment protects a parent's fundamental liberty interest in the care, custody, and control of her child, including the right to make medical decisions for a minor child and the right to familial association.

9.3 While L.S. was a minor, Holiday, Soliz, and Griffith deprived Plaintiff of these interests without due process of law by orchestrating and concealing from her an enrollment hold and an involuntary psychiatric detention of her daughter while Plaintiff was present and available; by

conditioning Plaintiff's access to her daughter during the detention on her acquiescence in the hold; and by supplying false and deceptive information to the officials and clinicians effectuating the detention, including the false statement that Plaintiff was threatening administrators and their children and the negative framing that the District's own investigation found directly influenced the psychiatric assessment.

9.4 These deprivations were deliberate, were unsupported by any legitimate governmental interest, and violated rights that were clearly established at the time. Holiday, Soliz, and Griffith thereby violated 42 U.S.C. § 1983, and Plaintiff suffered damages as a direct and proximate result, and is entitled to punitive damages against each of them.

**10.**

## Claim for Relief Count 6: 42 U.S.C. § 1983 - Municipal Liability (Against AISD)

10.1 Plaintiff incorporates and realleges sections 1-9 as if fully incorporated herein.

10.2 The constitutional violations described in Counts 4 and 5 were caused by policies, practices, and customs of AISD, including a custom or practice, so persistent and widespread as to have the force of policy, of excluding disabled students and retaliating against the parents who advocate for them; the delegation of final decision-making authority over L.S.'s enrollment to Holiday and Soliz, whose decisions the District implemented without review; and the District's ratification of its subordinates' unconstitutional conduct, including through its final policymakers' failure to implement the relief committed to at Level Three, failure to report the administrators involved to the State Board for Educator Certification notwithstanding its own investigation, and continued adverse treatment of Plaintiff and L.S. after the District's own findings.

10.3 These policies, practices, customs, delegations, and ratifications were the moving force behind the violations of Plaintiff's constitutional rights, in violation of 42 U.S.C. § 1983, and Plaintiff suffered damages as a direct and proximate result.

**11.**

**Demand for Jury Trial**

11.1 Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action. In accordance with the Federal Rules, this jury demand is being filed with the Clerk of the United States District Court for the Western District of Texas, Austin Division.

**12.**

**Prayer for Relief**

Wherefore, Plaintiff prays for relief as set forth below:

a.This Court assume jurisdiction over this action;

b.Enter an order finding in favor of Plaintiff's causes of action against Defendants;

c.Enter judgment awarding Plaintiff compensatory damages against all Defendants in a sum to be determined at the trial of this matter, exceeding the jurisdictional minimum;

d.Enter judgment awarding Plaintiff punitive damages against Defendants Holiday, Soliz, and Griffith on Plaintiff's claims under 42 U.S.C. § 1983;

e.Award Plaintiff's attorney's fees and costs, including pre- and post-judgment interest, pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b);

f.All such and further relief to which Plaintiff may be entitled as a matter of law and equity.

Dated: August 22, 2026

/s/ Jordan McKnight

Jordan McKnight
SBN: 24075586
P.O. Box 664
Little Elm, Texas 75068
Tel: (903) 271-4696
jordanmcknightlaw@gmail.com
*ATTORNEY FOR PLAINTIFF*